INDEPENDENT TUG LINE, Respondent, vs. LAKE SUPERIOR
LUMBER & BOX COMPANY, Appellant.

*February 23—May 2, 1911.*

*Lake Superior not an "international" body of water: National and
state boundaries: Foreign corporations: Right to do business:
Validity of contracts: Interstate commerce: Intrastate transpor-
tation.*

1. Lake Superior is not an international body of water in the same
   sense that the oceans of the world are. Its center is the bound-
   ary line between two nations, each of which has jurisdiction on
   its side of such line, though the whole body of water is open to
   the navigation of all vessels belonging to either nation.
2. The territorial limits of the state of Wisconsin extend to the na-
   tional boundary line on Lake Superior.
3. Sec. 1770b, Stats. (1898),—requiring all foreign corporations to
   comply with certain conditions before transacting business in
   this state, and declaring that contracts relating to property in
   this state made by a corporation not so complying shall be
   wholly void on its behalf but enforceable against it,—applies
   to every foreign private corporation which comes within the
   borders of this state to engage in strictly private intrastate
   business, irrespective of what its usual business is, or the in-
   strumentalities it uses, or the highway upon which it is car-
   ried on.
4. Thus, where a contract was made in Wisconsin by a Minnesota
   corporation, which was not as to such contract a common car-
   rier, to tow on Lake Superior between two points in this state
   saw logs cut from timber grown in this state, such work was
   strictly private intrastate business, voluntarily entered into, to
   which sec. 1770b, Stats. (1898), is applicable.
5. Although the requirement that foreign corporations engaged in
   interstate commerce must comply with the Wisconsin statute
   before making contracts for private intrastate transportation
   work in this state, may tend in some degree to hamper such cor-
   porations in the free exercise of their business, that indirect
   effect does not constitute such an interference with interstate
   commerce as to require the statute to be construed as not ap-
   plying to such contracts.
       TIMLIN, J., dissents.

APPEAL from a judgment of the circuit court for Bayfield county: JOHN K. PARISH, Circuit Judge. *Reversed.*

On June 6, 1907, the plaintiff, a Minnesota corporation, and the defendant entered into a written contract at Ashland, Wisconsin, wherein it was agreed that the former should tow a certain quantity of saw logs belonging to the latter from the mouth of Bad river, Ashland county, Wisconsin, to the Thompson mill at Washburn, Bayfield county, Wisconsin, at the price of thirty cents per thousand feet, log measure. This action was brought to recover $1,800, the amount alleged by plaintiff to be due to it for such service. The defendant by answer alleged that plaintiff was a foreign corporation which had never complied with the provisions of sec. 1770*b*, Stats. (1898) ; that it had not fully performed its contract; and, by counterclaim, charged negligence in that it permitted a quantity of logs to become lost. The jury, by special verdict, absolved the plaintiff from negligence and assessed its damages. in the sum of $1,500. From a judgment entered thereon the defendant appealed.

The cause was submitted for the appellant on the brief of *Lamoreux, Shea & Cate* and *W. S. Cate,* and for the respondent on that of *Dillon & Risjord.*

VINJE, J. The plaintiff corporation was organized under the laws of Minnesota and has never complied with the provisions of sec. 1770*b*, Stats. (1898), by filing with the secretary of state a duly authenticated copy of its articles of incorporation, and it is not claimed that it comes under the class of corporations excepted from the provisions thereof. In June, 1907, it entered into a contract with the defendant at Ashland, Wisconsin, to tow a certain quantity of logs on Lake Superior from the mouth of the Bad river, Wisconsin, to Washburn, Wisconsin. It is admitted that the logs in question were cut from timber grown within this state, and that the services performed were contemplated to be, and were in

fact, performed wholly within the state of Wisconsin. Sec. 1770*b* provides: "No corporation . . . incorporated otherwise than under the laws of this state . . . shall transact business, or acquire, hold or dispose of property in this state until such corporation shall have caused to be filed in the office of the secretary of state a duly authenticated copy of its articles of incorporation;" and further: "Every contract made by or on behalf of any such . . . corporation . . . affecting the personal liability thereof or relating to property within this state, before it shall have complied with the provisions of this section, shall be wholly void on its behalf and on behalf of its assigns, but shall be enforceable against it or them." The provisions of this section have been held constitutional. *Ashland L. Co. v. Detroit S. Co.* 114 Wis. 66, 79, 89 N. W. 904; *Chicago T. & T. Co. v. Bashford,* 120 Wis. 281, 97 N. W. 940; *Allen v. Milwaukee,* 128 Wis. 678, 106 N. W. 1099; *Duluth M. Co. v. Clancy,* 139 Wis. 189, 120 N. W. 854; *Hanna v. Kelsey R. Co.* 145 Wis. 276, 129 N. W. 1080; *Diamond G. Co. v. U. S. G. Co.* 187 U. S. 611, 23 Sup. Ct. 206. The grounds upon which its validity is sustained are that a foreign corporation is not a citizen of any state or of the United States within the meaning of sec. 2, art. IV, or of sec. 1, art. XIV, of the constitution of the United States, and has no right to exercise its franchises in any state other than that of its creation except upon such terms and conditions as each state may see fit to impose. *Ashland L. Co. v. Detroit S. Co., supra; Chicago T. & T. Co. v. Bashford, supra.* The conditions of the section in question are imposed upon foreign corporations for the purpose of protecting our citizens in their dealings with them to the same extent that they are protected in their dealings with each other, namely, to have the right to sue them in the courts of this state in respect to any liability arising out of any business, contract, or transaction within the state,—surely not an unreasonable condition. Nor is the burden of complying with the statute an onerous one.

124    SUPREME COURT OF WISCONSIN.    [MAY

Independent Tug Line v. Lake Superior L. & B. Co. 146 Wis. 121.

But it is contended by counsel for respondent that sec. 1770*b* does not apply in this case because the towing was done upon Lake Superior, which is a public international body of water, and any intercourse or commerce carried on upon said body of water is in no way subject to state regulations, and the case of *Lord v. Steamship Co.* 102 U. S. 541, is cited to sustain such contention. In the first place, it may be well to ascertain whether or not Lake Superior is an "international" body of water in the same sense that the oceans of the world are. By our treaty with England the boundary between the states and the British possessions was fixed in the center of the Great Lakes. The lakes themselves are not, like the oceans, a common waterway subject to the maritime law of all commercial nations. But the United States and England each has jurisdiction up to the center line of their respective sides. Of course the whole body of water of Lake Superior, or any of the Great Lakes, is open to the navigation of all vessels belonging to both nations, but that is an entirely different question from that of the determination of the international boundary.

By sec. 1 of the enabling act the boundary of Wisconsin, so far as here involved, was fixed as follows: "thence down the main channel of the Montreal river to the middle of Lake Superior; thence through the *center* of Lake Superior to the mouth of the Saint Louis river." In other words, the boundary of the state extended to the international boundary. Now the boundaries of nations bordering on oceans do not go to the center of such oceans. The three-mile limit from shore as fixed by international law is at best the extent of their individual national jurisdiction. Not so as to the Great Lakes. Our national jurisdiction extends to their center line. *U. S. v. Peterson,* 64 Fed. 145; *Ill. Cent. R. Co. v. Illinois,* 146 U. S. 387, 13 Sup. Ct. 110. It is therefore not correct to speak of Lake Superior as an international body of water. It does not lie between two nations. But its center is the boundary

line between two nations. What lies south of the center is United States territory; what lies north thereof is British territory.

Bearing this distinction in mind, let us examine the case of *Lord v. Steamship Co.* 102 U. S. 541, and see upon what grounds its decision is based. The ship Ventura was employed in navigation between San Francisco and San Diego, California, touching at intermediate points. She was lost at sea, and the question was whether the owner could avail himself of the provisions of sec. 4283, R. S. of U. S., relieving him from liability for goods lost. The court said:

"The contracts sued on in the present case were in effect to carry goods from San Francisco to San Diego by way of the Pacific ocean. They could not be performed except by going not only out of California, but out of the United States as well. . . . The Pacific ocean belongs to no one nation, but is the common property of all. When, therefore, the Ventura went out from San Francisco or San Diego on her several voyages, she entered on a navigation which was necessarily connected with other nations. While on the ocean her national character only was recognized, and she was subject to such laws as the commercial nations of the world had, by usage or otherwise, agreed on for the government of the vehicles of commerce occupying this common property of all mankind. She was navigating among the vessels of other nations and was treated by them as belonging to the country whose flag she carried. True, she was not trading with them, but she was navigating with them, and consequently with them was engaged in commerce. If in her navigation she inflicted a wrong on another country, the United States, and not the state of California, must answer for what was done. In every just sense, therefore, she was, while on the ocean, engaged in commerce with foreign nations, and as such she and the business in which she was engaged were subject to the regulating power of Congress."

It will be seen that the case was disposed of on the distinct ground that the vessel was not only outside the territory of California, but outside that of the United States itself, and

on the high seas when the loss occurred, and she was therefore subject to the regulations of Congress and not to the laws of California.    That the decision would have been otherwise had she remained within the territorial limits of the state is evident from this statement of the opinion:

"Congress has power 'to regulate commerce with foreign nations, and among the several states, and with the Indian tribes' (Const. art. I, sec. 8), but it has nothing to do with the purely internal commerce of the states, that is to say, with such commerce as is carried on between different parts of the same state, if its operations are confined exclusively to the jurisdiction and territory of that state, and do not affect other nations or states or the Indian tribes.    This has never been disputed since the case of *Gibbons v. Ogden,* 9 Wheat. 1."

From the principles laid down in the case cited, we find that the true test as to whether Congress or a state can regulate is not the kind of business the corporation is usually engaged in, nor the kind of instrumentalities it usually employs in its business, nor the fact that it is conducted on navigable waters.    But the test is, Does the business in question constitute interstate commerce either because it is carried on between the states or affects them, or because it is conducted on the high seas—"the common property of all mankind,"—and so becomes subject to such laws as the commercial nations of the world have established, and is therefore relieved from local state regulations?

Applying these tests to the facts in the instant case, we find that the contract for this business was made in Wisconsin.    It contemplated that all the work should be done within its borders.    All the work was so done.    The material towed had grown within the state, and there is nothing to indicate that it was ever intended to depart therefrom even in its manufactured form.    The only claim of exemption is that it was carried on on navigable waters by a vessel authorized to engage in interstate commerce.    But intrastate commerce may

be, and often is, carried on on navigable waters, and the bulk
of our interstate commerce is carried on on land.   The in-
strumentality used was as well adapted for intrastate business
as for interstate transportation.   It is only when the acts
done within the territorial boundaries of our state are beyond
the jurisdiction of the legislature to regulate or control—such
as interstate commerce—that an exception in the statute is
made.   It applies to every foreign private corporation that
comes within our borders to engage in strictly intrastate pri-
vate business, irrespective of what its usual business is, or the
instrumentality it uses, or the highway upon which it is car-
ried on.   The statute says to every_foreign private corpora-
tion alike: Before you can come into this state and make valid
contracts for carrying on strictly private intrastate business
you must comply with the provisions of sec. 1770*b;* failing in
that, you will have to suffer the penalties therein prescribed.

The plaintiff, as to this contract, was not a common carrier.
It was under no obligation to engage in or do the work.   The
towing was strictly private intrastate business voluntarily en-
tered into, and the question of the rights of common carriers
is not involved in the case.

But it may be urged that the application of the statute to
cases like the one in question indirectly affects interstate com-
merce because it makes it obligatory on foreign corporations
engaged in it to comply with the statute before they can enter
the state and undertake private intrastate transportation work
therein, and hence it has a tendency to hamper such agencies
in the free exercise of their business.   This objection is aptly
disposed of by HOLMES, J., in *Diamond G. Co. v. U. S. G.
Co.* 187 U. S. 611, 23 Sup. Ct. 206, where he says:

"In modern societies every part is related so organically to
every other, that what affects any portion must be felt more or
less by all the rest.   Therefore, unless everything is to be
forbidden and legislation is to come to a stop, it is not enough

128    SUPREME COURT OF WISCONSIN.    [MAY

Independent Tug Line v. Lake Superior L. & B. Co. 146 Wis. 121.

to show that, in the working of a statute, there is some tendency, logically discernible, to interfere with commerce or existing contracts.    Practical lines have to be drawn and distinctions of degree must be made."

The inconvenience to foreign corporations engaged in interstate navigation occasioned by the requirements of the statute is no greater than that imposed upon other foreign corporations who desire to do business in this state.    It cannot be held to be so great as to exempt them from the provisions of the statute.

The result we have arrived at on this branch of the case renders it unnecessary to consider whether or not the contract was an entire one.

*By the Court.*—Judgment reversed, and cause remanded with directions to dismiss the complaint upon the merits.


Siebecker, J., took no part.


Timlin, J. (*dissenting*).    The plaintiff, a foreign corporation, failed to comply with the requirements of sec. 1770b, Stats. (1898), as amended by ch. 506, Laws of 1905, and ch. 275, Laws of 1907.    These are statutes requiring it to file a copy of its articles of incorporation with the secretary of state, appoint the latter a resident agent, pay a fee, etc. It nevertheless entered into a contract with defendant under and pursuant to which plaintiff's steam vessel, Tom Dowling, which is registered and licensed under the navigation laws and regulations of the United States, performed for defendant certain services in towing logs upon the waters of Lake Superior from one point or port in Wisconsin to another point or port in the same state.    The contract declared upon may be considered a maritime contract.    1 Cyc. 834.    The Wisconsin statutes above referred to declare void and nonenforceable in behalf of the foreign corporation all contracts made by it unless the corporation complies with these statutes.    They

also impose a penalty for transacting business in this state. Notwithstanding these statutes are general in their terms and include all contracts made by unlicensed foreign corporations, interstate commerce contracts are not within the general words of the statutes. *Elwell v. Adder M. Co.* 136 Wis. 82, 116 N. W. 882, and cases; *Waters-Pierce Oil Co. v. Texas,* 177 U. S. 28, 20 Sup. Ct. 518. ` Cf. *Trade-mark Cases,* 100 U. S. 82. This was necessary to uphold the constitutionality of the statute. Should the same statutes be held to cover the case of a foreign corporation operating upon the waters of Lake Superior a registered and licensed vessel of the United States, so that it may contract for cargo or carriage between the ports of different states or between the ports of one state and those of Canada, but cannot carry or make a valid contract of carriage on these waters between two ports of the same state? I think not. Congress has extended its interstate commerce regulations further with reference to navigation and with reference to carriers upon navigable waters than it has with reference to other carriers of commerce. I think the statute as construed in the majority opinion interferes with the interstate commerce regulations of Congress, and that the statute should not cover or include the contract in question. If the vessel, notwithstanding it has complied with the federal regulations as to registry, enrolment, and license, must also comply with the state regulations before it can make a contract of coastwise carriage from one port to another port in the same state, then the federal license is ineffective. This interstate carriage may be interfered with and rendered impossible or unprofitable if it cannot carry from port to port of the same state. To make navigation unprofitable is to make it impossible. The waters of the Great Lakes are in a sense high seas, international navigable waters, and to my mind it is entirely fallacious to argue that because certain facts present in *Lord v. Steamship Co.* 102 U. S. 541, are not present in this case, therefore this case is not subject to the

rule of law applied in the *Lord Case.* The existence of certain facts may justify or require a certain conclusion, but it does not follow that the nonexistence of these facts will justify the opposite conclusion. Other facts may furnish support to the conclusion. I think we should hold that the contract in question here was not affected by the state statutes above referred to. This view is further supported by the fact that the statutes in question (Laws of 1905, ch. 506) exempt railroad corporations from their provisions. Hence in order to be equal and uniform in their operation they must exempt carriers by water. So far as they deny the equal protection of the laws to persons between whom there exists no reasonable ground of distinction or classification for the purpose of the act, the statute would be invalid. The result of the majority decision will, I fear, be that this plaintiff or others having like contracts will proceed in the courts of admiralty, where the contract may be held valid and enforceable, and thus give us a class of contracts invalid in the state courts but valid in the federal courts. *The Daniel Ball,* 10 Wall. 557; R. S. of U. S. § 4318; *Harmon v. Chicago,* 147 U. S. 396, 13 Sup. Ct. 306; *U. S. v. Rodgers,* 150 U. S. 249, 14 Sup. Ct. 109; *Lord v. Steamship Co.* 102 U. S. 541; *Gibson v. U. S.* 166 U. S. 269, 17 Sup. Ct. 578; *Rutz v. St. Louis,* 7 Fed. 438; *Frost v. Washington Co. R. Co.* 96 Me. 76, 51 Atl. 806, 59 L. R. A. 68; Prentice & Egan, Commerce Clause, 98, 137, 167, 326.